**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Christina Marie CHASE, Defendant-Appellant.**

**No. 73–2490.**

United States Court of Appeals,
Ninth Circuit.

May 3, 1974.

Wallace, Circuit Judge, concurred specially and filed opinion.

David W. Williams, District Judge, filed dissenting opinion.

Joseph A. Milchen (argued), of Mc-Inerney, Milchen & Frank, San Diego, Cal., for defendant-appellant.

Thomas M. Coffin, Asst. U. S. Atty. (argued), Harry D. Steward, U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before CHOY and WALLACE, Circuit Judges, and WILLIAMS,* District Judge.

CHOY, Circuit Judge:

The appellant, Christine Chase, was convicted of illegally importing three pounds of cocaine.[1] She contends on appeal that the narcotics were discovered as the result of an unlawful strip search conducted at the border. We affirm.

On December 13, 1972 appellant, upon entering the United States from Mexico, was halted at the Calexico, California point of entry. After preliminary questioning, a search of her car and luggage, and a Customs Bureau computer check all revealed reason to be suspicious of her, she was taken to a secondary inspection room to be personally searched by a matron.

What happened there is the subject of much dispute. Appellant contends that a strip search was conducted for which the requisite "real suspicion," see, e. g., United States v. Guadalupe-Garza, 421 F.2d 876, 879 (9th Cir. 1970), was lacking. The government counters that contraband was initially discovered in her right sock, before any of her other clothing had been shed, when one of appellant's boots was removed. This, the government urges, was not a strip search, but merely a conventional border search for which no particular showing of cause is required.[2] The trial court agreed that the first batch of cocaine was found in appellant's sock, prior to her undressing, after her boot was taken off, and that this was not a strip search.

We must first determine if the factual finding that the boot was initially removed is clearly erroneous.[3] At the suppression hearing the matron, Linda Jiminez, testified on direct examination that Chase had first taken off her right boot, revealing a package of cocaine in

---

* The Honorable David W. Williams, United States District Judge for the Central District of California, sitting by designation.

1. The conviction was for violating 21 U.S.C. §§ 952 and 960.

2. Appellant does not dispute that a search short of a strip was justified. See Henderson v. United States, 390 F.2d 805, 808 (9th Cir. 1967). Nor does appellant dispute that if contraband was first found in other than

a strip search, a subsequent full strip search was proper.

3. Findings of fact made at a suppression hearing will only be overturned on appeal if clearly erroneous. See, e. g., United States v. Welp, 469 F.2d 688 (9th Cir. 1972); Jackson v. United States, 122 U.S.App.D.C. 324, 353 F.2d 862, 864–865 (1965); United States v. Page, 302 F.2d 81, 85 (9th Cir. 1962).

her sock, following which she removed her left boot disclosing two more packets of cocaine. Then, Jiminez said, she pulled off her sweater and pulled up an "undergarment" (apparently a body suit) revealing packages of cocaine taped around her waist. On cross-examination and again on redirect, however, Jiminez became confused and stated she could not recall whether Chase's sweater was removed—and thus whether she was partially undressed—before the boots were removed or whether her clothing was intact when the cocaine was found in the boots. Jiminez continued to insist, though, that the first packages of cocaine were discovered in appellant's boots and not underneath her sweater.

Appellant contradicted Jiminez's story. Chase averred that she had, at the outset of the search, partially disrobed by pulling both her sweater and her body suit up to her shoulders. At that time, appellant claimed, the matron had discovered the packages taped around her waist. Only after that, she testified, were her boots removed.

We cannot say that the district court clearly erred in finding that the search commenced with the removal of appellant's boots. First, while the matron's testimony is somewhat contradictory, her testimony on direct does provide support for the trial judge's conclusion.

▮ Second, in certain restricted circumstances—where, for example, a witness' story is implausible—disbelief of testimony on a certain point can support the truth of what the witness denies. *See, e. g.,* United States v. Castro, 476 F.2d 750, 753 (9th Cir. 1973); United States v. Barham, 466 F.2d 1138, 1140–1141 (9th Cir. 1972), cert. denied,

410 U.S. 926, 93 S.Ct. 1356, 35 L.Ed.2d 587 (1973); Anderson v. Knox, 297 F. 2d 702, 726 (9th Cir. 1961), cert. denied, 370 U.S. 915, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962); Ege v. United States, 242 F.2d 879, 881 (9th Cir. 1957).

> A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn.

United States v. Cisneros, 448 F.2d 298, 305 (9th Cir. 1971); *see also,* United States v. Hood, 493 F.2d 677 (9th Cir. 1974). We think this is one of those situations.[4] Appellant had an obvious motive to falsify. Moreover, her story contrasted with that of the matron not only with respect to appellant's state of undress when she took off her boots, but also as to which items of contraband were discovered first. From the latter conflict the district judge could have concluded other portions of her narrative were the opposite of what she claimed as well. Finally, the record shows appellant to have been undergoing methadone treatment for narcotics addiction and to have been a frequent user of tranquilizers at the time of the suppression hearing. The trial judge, who was very concerned with the effect of these conditions upon the guilty plea she entered on the same day as the suppression hearing, could well have concluded they affected her ability to recall the search.

▮ Accepting the trial judge's finding, we simply cannot say that the mere removal of a boot is the type of "serious invasion of privacy" which the

---

4. We emphasize that the use of denials to support opposite propositions is limited. It could not be used to support a finding of fact where, for example, the only basis for drawing the opposite inference was demeanor. Otherwise, a fact finder's decision would be unreviewable. *See* Dyer v. MacDougall, 201 F.2d 265, 268–269 (2d Cir. 1952) (L. Hand, J.) There must be other objective evidence on the record which buttresses the fact finder's drawing of the opposite inference. *See* United States v. Cisneros, 448 F.2d 298, 306 n. 10 (9th Cir. 1971) ("It should be noted that Judge Hand [in *Dyer*] carefully circumscribed the limitations of the quoted statement. We also subscribe to those limitations.")

real suspicion standard, applicable to strip searches, was designed to limit. *See* United States v. Guadalupe-Garza, 421 F.2d at 879. The origin of the real suspicion test is, of course, in the fourth amendment's proscription of unreasonable searches. Since a strip search involves an embarrassing imposition upon the victim, we have reasoned, it would be unreasonable to conduct such searches without real suspicion. *See, e. g.*, Henderson v. United States, 390 F.2d 805, 807–808 (9th Cir. 1967). Real suspicion should, therefore, limit searches only when there is a similar danger of embarrassment: where, in short, the suspect is forced to disrobe to a state which would be offensive to the average person. Judged by this standard, the removal of a boot is surely not a "strip." Rather, it is like one removing an overcoat or a suit jacket—relatively innocuous. *See* Shorter v. United States, 469 F.2d 61 (9th Cir. 1972), cert. denied, 411 U.S. 918, 93 S.Ct. 1555, 36 L.Ed.2d 310 (1973); Murray v. United States, 403 F.2d 694, 697 (9th Cir. 1968) (both: removing a coat not a strip search).

■■ Nor can we say that a strip search commences with the order to a suspect to remove her clothing. While the record is not entirely clear on this point, it is possible that the matron first ordered Chase to remove all her clothing, not merely her boots.[5] Assuming this is true, it should not vitiate the search. *Cf.* United States v. Stornini, 443 F.2d 833 (1st Cir.), cert. denied, 404 U.S. 861, 92 S.Ct. 162, 30 L.Ed.2d 104 (1971) (appellant stripped, but contraband found independently in coat; since it was proper to search the suspect's clothing, evidence was not discovered via a strip search).[6] The reason real suspicion is required to conduct a strip

search is not because the command to strip is intrusive but because the actual search of a stripped person is. It is, after all, the stripping which is offensive to privacy, not the words which order the strip search. Thus, whether a strip search occurred should be measured by what the subject objectively did.

There was, then, no strip search in this case when the initial batch of cocaine was found. The subsequent strip search was supported by probable cause —that initial batch of contraband.

Affirmed.

WALLACE, Circuit Judge (specially concurring):

I concur with my Brother Choy except for the restrictions I believe he places on our language in United States v. Cisneros, 448 F.2d 298, 305 (9th Cir. 1971). In that case we indicated that the trier of fact's disbelief of a defendant's testimony may, in part, provide the basis for a finding contrary to that which the defendant has stated. See opinion of Judge Choy, page 573 and n. 4. I would go no further than to state what was held in United States v. Hood, 493 F.2d 677 (9th Cir. 1974):

> Further, both Hoods testified, denying any knowledge of the heroin. Disbelief of their sworn testimony, along with other evidence, can be the basis of a finding that they in fact possessed the requisite knowledge. *See* United States v. Cisneros, 448 F. 2d 298, 305 (9th Cir. 1971).

Whether the testimony of a defendant or any other witness has a ring of genuineness or not often becomes most significant in finding where the truth lies. That this touchstone is difficult to review on appeal does not militate against

---

5. At the suppression hearing, the matron first testified that she initially asked Chase to remove her boots. (Tr. at 9.) Later, she testified she orderd Chase to undress completely. (Tr. at 15.)

6. It is true that in both Shorter v. United States, 469 F.2d 61 (9th Cir. 1972) and

Murray v. United States, 403 F.2d 694, 697 (9th Cir. 1968), the suspects were not ordered to take off all their clothing. Neither panel, however, regarded the command to remove the clothing as the equivalent of a strip search, as the dissent here intimates, *infra*, text at p. 575 n. 1, since that question was not before them.

its fundamental importance in ascertaining what the actual facts are. I would, therefore, not restrict the applicability of *Cisneros* as I feel Judge Choy has.

As this difference does not affect the outcome of this particular case and as I am in harmony with the remainder of Judge Choy's opinion, I concur.

DAVID W. WILLIAMS, District Judge (dissenting):

In the face of confusing and contradictory testimony as to where the contraband was first discovered about the body of appellant, I will agree that the trial court finding that the first batch of cocaine was found in appellant's sock, prior to her completely undressing is not clearly erroneous. However, irrespective of the sequence of disrobing, I respectfully disagree with the conclusion of the majority that the facts of the search indicate that a mere border search occurred. To the contrary, I would characterize the instant search as a strip search, thus requiring the government to provide a more stringent justification therefor. I do not believe that this has been shown.

The record clearly shows that Chase was ordered to take off all her clothing by a customs inspectress, and that contraband was discovered shortly after she began to carry out the order. This Court has previously held that "the forced disrobing of a person entering the country violated the Fourth Amendment unless there was 'at least a real suspicion, directed specifically to that person.'" United States v. Johnson, 425 F.2d 630, 632 (9th Cir. 1970), cert. dismissed, 404 U.S. 802, 92 S.Ct. 38, 30 L. Ed.2d 35 (1971). If a party "is to be required to strip," a strict justification of real suspicion must be demonstrated. Henderson v. United States, 390 F.2d 805, 808 (9th Cir. 1967).

The facts here are demonstrative of a strip search as we have previously defined the term. Chase was not merely requested to remove a boot or a coat; she was ordered to remove all her clothes. Thus I believe that the majority misplaces reliance upon cases in which a party was merely asked to remove an overcoat, Shorter v. United States, 469 F.2d 61 (9th Cir. 1972), cert. denied, 411 U.S. 918 (1972), and Murray v. United States, 403 F.2d 694 (9th Cir. 1968).[1] Even if it is assumed that contraband was first found on Chase after the removal of her right boot, the facts in this case indicate a far more serious intrusion into her bodily privacy than in *Shorter* or *Murray*. Chase was not asked merely to remove a boot. The record is clear that Customs Inspector Ward ordered a strip search of Chase. Customs Inspectress Jiminez testified that she instructed Chase, "[T]ake off all your clothing." (Tr. 15). In the course of removing her clothing, contraband was discovered.

---

1. In *Shorter* the defendant was escorted to a secondary examination room after a customs agent noticed his nervous behavior, as well as the fact that "Shorter's face was perspiring heavily and that despite the warm humid weather Shorter was bulkily dressed wearing an overcoat, a suit coat, and a dress shirt open at the neck exposing a turtle neck sweater underneath." 469 F.2d at 62. Shorter was requested to remove his overcoat and his suit coat and to empty his pockets onto the table, and then asked if he had failed to declare anything. Shorter then claimed, "you got me," and lifted the front of his shirt exposing a waist girdle containing packages of heroin. Shorter was arrested and it was only at this point that a strip search was ordered—revealing additional heroin. The Court noted that the heroin was first discovered before any strip search occurred:

"He was not subjected to either a skin or a body search until after the first packets of heroin were discovered. Therefore, the 'real suspicion' test is not applicable and this search comes well within the regular border search standard." id. at 63–64.

Similarly, in *Murray* the defendant was merely "told to empty everything from his pockets and to remove his coat." 403 F.2d at 695. As the defendant removed his coat, a customs agent observed rubber contraceptives containing heroin attached to his arm. No strip search was ordered and thus the Court held that the mere request to remove one's coat does not constitute a strip search.

No previous case has directly confronted this factual situation. Whether the contraband was first discovered when Chase removed her boot or her blouse is irrelevant. The sequence of disrobing should not be determinative of the invasion of privacy. At the point in time when Chase began to undress in obedience to an order to "take off all her clothing," her right to expect privacy of her body had been invaded. The instant search is precisely the "forced disrobing" which is referred to in United States v. Johnson, supra.

I am of the opinion that the officers had no basis upon which to reach the decision that appellant should be subjected to a strip search or to order her to an enclosure where it could be conducted. There must first be made a determination whether in this case any kind of personal search was called for after the initial search of the car and interrogation of its occupants.

In December, 1972, Special Agent Beaulieu placed appellant's name and vehicle license number into the Customs CADPIN system because he had received information from an informant that Christine Chase was going to travel to Bogota, Colombia on November 28, 1973 on Avianca Airlines. Beaulieu had also learned that certain suspected cocaine couriers were to be on the same flight and that these couriers had been driven to the airport by a convicted narcotics violator. Colombia is well-known as the point of origin of cocaine. The agent was also aware that appellant's husband was a convicted narcotics violator (possession of marijuana) and that he had recently been arrested in the Los Angeles area on charges of possession of cocaine. The informant had given information to Beaulieu on two prior occasions, neither of which resulted in an arrest. Neither Chase nor any of the other suspects on the flight had a prior criminal record and there is no evidence of any connection or association between Chase and the other suspected cocaine couriers.

Two weeks later, appellant, her son and a male companion entered the United States from Mexico at Calexico, California. Appellant told the customs inspector that they were coming from Mexico where they had spent four hours. A pat-down of Chase and her companion and a search of her purse proved negative. A search of the car and luggage done with the assistance of a trained dog also failed to turn up contraband. The agent did find a hotel ashtray from Colombia and a Colombian magazine in the automobile which indicated a recent visit to that country, but there is no evidence that the parties were queried about this. Customs Inspector Ward fed the license number of the vehicle into the CADPIN system and a positive response or "hit" was received. Ward then ordered a strip search of appellant [2] and she was taken to an enclosure where an inspectress performed the search. The only reasons given for the strip search were the discovery of the two items from Colombia and the "hit" on the CADPIN system. Ward testified that he did not believe that Mrs. Chase was concealing anything or that she was lying about anything or trying to mislead him. When she told him she was coming from Mexico, he asked no further questions about her travels. (Tr. 62).

The best that can be said is that Ward had a hunch that appellant had contraband concealed on or in her body despite the fact that the earlier search produced nothing. It is true that his hunch in this case was correct and contraband was found concealed about her person. But should such a lucky hunch be the guideline in a determination of which females should or should not be

---

2. Agent Ward testified that "We went ahead and searched the car, every conceivable place that we could find, all of the compartments. We went through all of the souvenir items which was (sic) in the car, and when we came up with nothing, we went back into the office for a personal search on the passengers of the car, and we requested that Mrs. Chase be searched." (Tr. 61).

called upon to undress and yield to a skin and/or cavity search? Admittedly this approach would frustrate the detection of contraband on the person of many couriers, but when we weigh the damage that can be done psychologically to many hundreds of innocent strip search victims against the amount of contraband that may enter the United States via body strapping or cavity concealment, I would favor a rule that would require a great deal more than a hunch.

It is settled that even though probable cause is not required to initiate a border search (Henderson v. United States, 390 F.2d 805, 808 (9th Cir. 1967)), "mere suspicion" of contraband does not justify initiating a strip search. This Court has required that a strip search be supported by real suspicion. *Henderson,* supra at 808. Such suspicion has been defined as subjective suspicion supported by objective, articulable facts that would lead an experienced, prudent customs official to suspect that a particular person seeking to cross the border is concealing something on his body for the purpose of transporting it into the United States contrary to law. United States v. Guadalupe-Garza, 421 F.2d 876, 879 (9th Cir. 1970); United States v. Johnson, 425 F.2d 630, 632 (9th Cir. 1970). In addition, the objective articulable facts must bear some reasonable relationship to suspicions that something is concealed on the body of the person to be searched; otherwise, the scope of the search is not related to the justification for its initiation as it must be to meet the reasonableness standard of the Fourth Amendment. *Guadalupe-Garza* at 879.

The "real suspicion" test is not "mere suspicion" or a hunch. It is clear from the record that the search of appellant was based on the computer "hit" which the customs officials received from the CADPIN system and the Colombian artifacts which were found in the car. Although the artifacts may have been

some indication that the appellant did not declare the full extent of her foreign travel, Ward did not question appellant concerning these items.

A computer report on an individual can supply the necessary real suspicion to justify a strip search so long as the official originating the report has such information as would have justified him in personally conducting the search. United States v. Williams, 459 F.2d 44 (9th Cir. 1972). When agent Beaulieu placed appellant's name and vehicle number into the CADPIN system all he knew concerning her was that she intended making a trip to Bogota aboard the same flight that was carrying other persons whom he suspected of being cocaine couriers. He had no information that Chase's trip was for the purpose of obtaining contraband or that she had any connection whatsoever with the other suspects aboard. Appellant's relationship to the suspected couriers was not in any respect different from any of the other passenger relationships to those suspects. If the information which Beaulieu possessed at the time he submitted appellant's name and number into the computer system constitutes the requisite "real suspicion," then virtually every passenger on the flight to Bogota would legally have been a candidate for a strip search upon their return to the United States.

The very purpose of this Court's stringent requirements for a strip search is to protect innocent men and women from the degradation and humiliation which such a search entails. There is no question that a vast number of innocent individuals are subjected to strip searches when crossing the border.[3]

I find it difficult to accept the conclusion that Beaulieu's facts, although objective and articulable, bore some reasonable relationship to a suspicion that contraband would be concealed on the body of appellant. I therefore must conclude that the officer originating the

3. See Judge Ely's dissenting opinion in United States v. Holtz, 479 F.2d 89 (9th Cir. 1973).

computer report did not have "such information as would have justified him in personally conducting the search" of appellant. In precisely the same situation this Court reversed a conviction founded upon evidence procured incident to a search which was triggered by an unreliable computer report. United States v. Williams, supra.

I would reverse because the denial of appellant's motion to suppress was erroneous.